IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 4:07 CR 3079 |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| JOSE ROMO-CORRALES and | ) | REPORT, RECOMMENDATION |
| FRANCISCO GALVAN-VALDEZ, | ) | AND ORDER |
| | ) | |
| Defendants. | ) | |

Defendants have filed motions to suppress evidence obtained in two warrant searches of a residence in Grand Island, Nebraska. Defendants claim that the officers conducting a search pursuant to the first search warrant misled the undersigned magistrate judge into issuing that warrant and also exceeded the scope of the warrant in executing the search. They also claim that the evidence obtained in the second search of the residence is fruit of the poisonous tree, obtained as a direct result of the unlawful conduct throughout the first warrant process. An evidentiary hearing on the motions was held on July 21, July 22, and July 25, 2008 before the undersigned. I now make my findings and conclusions of law, and recommend that the motions be denied.

FACTS

On May 25, 2007 Investigator Mark Dreher of the Grand Island, Nebraska Police Department was the affiant on an application for a search warrant presented to the undersigned magistrate judge. Exhibit 1. The application sought a warrant to search 315 East

Dodge Street, Grand Island, Nebraska, for the person of Fidel
Emerjildo Martinez, a fugitive, and "[d]ocumentation, receipts or
items of venue which show Fidel E. Martinez' possession or domain
of the residence."  Id. p. 3.  The affidavit in support of the
application stated that on October 28, 2002 Martinez had been
convicted    in    this    court    of    conspiracy    to    distribute
methamphetamine.  He had been sentenced to 135 months imprisonment,
served time, and had been released on supervised release.  On
February 26, 2007 his probation officer had filed a petition for
offender under supervision, stating that Martinez had absconded,
and a warrant had been issued for his arrest.  The affidavit
further stated that a Todd Friesen, landlord at the residence last
associated with Martinez, had advised Dreher that some Hispanic
males had moved into another property he owned, and Friesen
identified a picture of Martinez as a person who had paid Friesen
a rent payment for 315 East Dodge Street since Martinez'
whereabouts had been unknown.  The affidavit further stated that
Dreher had learned ten days prior to the application, in
information provided in response to an administrative subpoena,
that Martinez was the utility subscriber for natural gas at 315
East Dodge Street.  The affidavit further stated that the day
before the warrant application, two subjects were seen outside the
residence at 315 East Dodge Street, and a Hispanic male matching
the description of Fidel Martinez had been seen entering the
residence.  Id. at 6.  The application concluded by seeking a
warrant authorizing the search of "the residence, garage,
outbuildings, and curtilage of 315 East Dodge Street, Grand Island,
Hall County, Nebraska, and any and all persons and any and all
vehicles associated with said property or persons at the time the
warrant is served, for the person of Fidel E. Martinez, and any
documentation, receipts or venue items showing Fidel E. Martinez'
possession or domain of the residence . . . ."   Id.   The

2

undersigned magistrate judge granted the application and issued the warrant.  Id. at 14.

Evidence adduced at the hearing established that during the several months prior to the application for the search warrant for 315 East Dodge Street, Dreher and others in the Tri City Drug Task Force had been collecting information about drug transactions that reportedly were or had been occurring in that neighborhood, possibly including at that residence.  Most recently, Dreher had taken a proffer statement on approximately May 11, 2007 from a defendant in another drug case who talked about "a group" of Hispanic males "down on East Dodge" who had been dealing drugs. The information obtained, however, did not identify individuals by name, but only by nicknames.  Dreher had sought the administrative subpoena for utility information in order to get a name associated with the residence.

A team of law enforcement officers was assembled to serve the warrant.  Prior to the actual execution of the search, Dreher held a briefing for the team members, during which he reviewed with them the fact that the warrant covered only the person of Fidel Martinez and venue items or documents connecting him with the residence.  He also stated that if any items of an evidentiary value, particularly regarding drug trafficking, were spotted during the search, Dreher was to be notified so the search could be stopped.

The warrant was served on May 30, 2007 at approximately 7:00 a.m.  A "tactical response team" of seven to ten law enforcement officers entered the residence first, and "swept" all areas looking for persons.   Two Hispanic males were found and were brought outside and detained.   After the residence and garage had been "cleared" by the tactical team, a "search team" of six officers

entered the house and garage to search for venue items as listed in the warrant.

While searching for venue items in the garage, Investigator Dreher found two containers of MSM, a hot plate, and several firearms. He testified that these items were not covered by any objects, and were in plain view. Their importance to law enforcement was apparent, because MSM is a horse medication frequently used as a "cutting agent" for methamphetamine; hot plates are frequently used for heating MSM in "re-rocking" operations to cut methamphetamine; denatured alcohol is commonly used in "cleansing" or "re-rocking" methamphetamine; and guns are frequently associated with drug trafficking. Also found in the garage was a natural gas bill addressed to Martinez at 315 East Dodge Street. Also found in the garage were broken light bulbs, described as "bowls" commonly used in smoking methamphetamine.

While searching in a bedroom, Investigator Scott Javins of the Nebraska State Patrol, another officer assigned to the Tri City Drug Task Force, found a .40 caliber handgun under a mattress. In addition, he found venue items in a drawer in a dresser/night stand, Exhibit 10, upper left, and also a partial baggie with what he suspected was drug residue on the floor behind the night stand. Exhibit 11, lower left.[1] He also found a business card and a social security card, Exhibit 10, lower right.

Javins proceeded to an adjacent laundry room. In a laundry hamper of dirty clothes, while looking for "pocket trash" that might contain venue items, he found a scale located under some

---

[1] The dresser/night stand had been moved before the picture was taken, but the baggie had not.

laundry.  Exhibit 12, lower right.[2]  He also found in that room a vacuum packer food saver, which he knew could be used in packaging drugs.  As Javins opened a fold-out door to the "mechanical room" portion of the laundry room, he kicked an orange, cylindrical Gott cooler about two feet tall.  He realized it had some "weight to it," opened it and with his flashlight looked inside.  He saw a clear liquid which he believed to be denatured alcohol (which he knew from his training is commonly used in "re-rocking" or "cleansing" methamphetamine) and what he believed to be crystals of methamphetamine in the bottom of the cooler.  To the left of the cooler was a gallon container of denatured alcohol.  Exhibit 12, lower left.  At this point Javins called Investigator Dreher into the laundry room and showed him what he had found.  Dreher then stopped the search.

Jason Ackles, an Adams County Deputy Sheriff also assigned to the Tri City Drug Task Force, testified that he was directed to search another bedroom and the bathroom of the residence.  In the bedroom he shined his flashlight behind a picture hanging on a wall and saw some papers behind it; he moved the picture and the papers fell out, but they were apparently not related to venue or otherwise valuable.

He proceeded to the bathroom.  There, he shined his flashlight behind a mirror hanging on the wall above the sink.[3]  He saw torn

---

[2] The laundry which covered the scale had been removed when the picture was taken.

[3] Ackles' testimony termed the item on the wall a "vanity," a "medicine chest," or a "mirror."  From his various descriptions and Exhibit 14, I conclude it was either a mirror or a medicine cabinet which was hanging "on" the wall, that is, not recessed "into" the wall.  Exhibit 14 shows a hole in the wall which was described as 6" X 8," too small to be a receptacle for a medicine

paper which he described as "torn sheet rock" paper, showing that the wall there had been "altered" in some way.  He lifted the mirror off the wall and saw a hole approximately 6" x 8" in which were plastic bags containing what he thought to be more than a quarter pound of methamphetamine or amphetamine, some papers, and a scale.  He immediately notified Investigator Dreher, who came to the bathroom.  Once these items were found, the search was stopped no later than 8:30 a.m.  The residence was secured until a second search warrant could be issued authorizing a further search for additional contraband.

Once the search of the residence was stopped by Investigator Dreher, he communicated with other law enforcement officers, specifically Monte Czaplewski, a special agent with the Federal Bureau of Investigation.  Czaplewski prepared an application for a second search warrant for the residence at 315 East Dodge Street.  That application was presented to the undersigned magistrate judge on May 30, 2008 at approximately 10:35 a.m.  Exhibit 2, pp. 1-15.  After describing the first search and reciting that although Martinez had not been found, numerous items connecting Martinez to the residence had been found, Paragraph 14 of the application described the items of an incriminating nature which had been found "in plain view" during the first search, including:

- ▸ Two 1-pound containers of MSM (a horse vitamin) in the garage
- ▸ A hot plate in the garage
- ▸ Denatured alcohol in the garage
- ▸ Glass bowls in the garage consistent with smoking methamphetamine

---

cabinet to be recessed into it.

- ▸ The cooler in the laundry room containing clear liquid and a clear crystalline substance in the bottom
- ▸ Another container of denatured alcohol in the laundry room
- ▸ A digital scale with liquid on it found in the laundry basket under some clothing
- ▸ Undescribed "paperwork" hidden behind a picture hanging on a bedroom wall
- ▸ Two ziplock plastic bags found in the hole in the wall behind the bathroom vanity which appeared to contain approximately one-half pound[4] of a white crystalline substance consistent with methamphetamine[5]

The application sought a warrant authorizing the search of the residence, garage, outbuildings, curtilage at 315 East Dodge Street, together with any persons or vehicles associated with it at the time the warrant is served, for Fidel E. Martinez, "and any items including controlled substances, paraphernalia, records, documents and materials as defined in this affidavit or listed in Attachment B which constitute instrumentalities, fruits of evidence and [sic] violation of federal laws, including but not limited to Title 21, United States Code, Section 841 (a)(1), 841(b)(1) and

---

[4] Deputy Ackles testified that he estimated the amount of crystalline substance to be "more than a quarter pound, but less than a pound." Whether it was a quarter pound or a half pound as stated in the affidavit is not material to the resolution of this motion.

[5] Notably the gun and the baggie with residue found in the bedroom and the guns found in the garage, although found during the initial search, were not mentioned in the affidavit supporting the second warrant application.

846, *et seq.*" Exhibit 2, p. 8.  I granted the application and signed the requested search warrant at 10:50 a.m.  Id. at 16.


LEGAL ANALYSIS


There is no claim by defendants that the second application for search warrant did not present probable cause for the issuance of that warrant.  Rather, defendants claim that the application for the first warrant was misleading, and that the officers executing the first search warrant exceeded the scope of the search authorized by that warrant.  The government did not file a brief in response to the motions.


The defendants' initial arguments are essentially that (a) the application for the first search warrant was a subterfuge for obtaining authorization to conduct a search for drugs and drug-related contraband at 315 East Dodge Street; (b) the failure of the affiant in the warrant application to disclose this motive for seeking the warrant violated Franks v. Delaware, 438 U.S. 154 (1978); and (c) although the warrant authorized a search for only Fidel Martinez and items of venue, the officers conducted a thorough search of the residence for drugs and drug related evidence, which was beyond the scope of the search authorized by the warrant.


The Eighth Circuit has summarized the Franks criteria as follows:

> In Franks, the Supreme Court held that a search warrant
> must be voided and the fruits of the search suppressed if
> a defendant proves by a preponderance of the evidence
> that (1) a law enforcement officer knowingly and

intentionally, or with reckless disregard for the truth, included a false statement in the warrant affidavit, and (2) without the false statement, the affidavit would not have established probable cause.  438 U.S. at 155-56; United States v. Snyder, 511 F.3d 813, 816 (8th Cir. 2008).  This rationale also applies to information that the affiant deliberately or with reckless disregard for the truth omits from the affidavit such that the affidavit is misleading and insufficient to establish probable cause had the omitted information been included. United States v. Jacobs, 986 F.2d 1231, 1234 (8th Cir. 1993) (citing United States v. Reivich, 793 F.2d 957, 960 (8th Cir.  1986)).  To show reckless disregard for the truth, we do not look simply at whether a statement included in the affidavit was true; rather, we ask whether, when looking at all the evidence available to the officer, the officer "must have entertained serious doubts as to the truth of his [or her] statements or had obvious reasons to doubt the accuracy of the information he [or she] reported."  United States v. Schmitz, 181 F.3d 981, 986-87 (8th Cir. 1999) (alterations in original) (quoting United States v. Clapp, 46 F.3d 795, 801 n. 6 (8th Cir. 1995)).  An affidavit submitted in support of a warrant carries a presumption of validity. Franks, 438 U.S. at 171.  A showing of negligence or innocent mistake is not enough to establish a Franks violation.  Id.; Snyder, 511 F.3d at 816.  Nevertheless, an officer may not circumvent the Franks doctrine by providing only selective information to another officer who is unaware of the full information and therefore includes false information or omits material information from an affidavit in support of a warrant.  See United States v. Davis, 471 F.3d 938, 947 n. 6 (8th Cir. 2006) (citing Franks, 438 U.S. at 164 n. 6; Jacobs, 986 F.2d at 1235; see also Illinois v. Andreas, 463 U.S. 765, 772 n. 5 (1983)("where law enforcement authorities are cooperating in an investigation, as here, the knowledge of one is presumed shared by all").  Thus, we must look at the actions of . . . the affiant, as well as the actions of the local law enforcement officers who provided information for [affiant] to include in the affidavit.

United States v. Neal, 528 F.3d 1069, 1072-73 (8th Cir. 2008) (Although false information was in affidavit, it was not included

9

intentionally, deliberately, or with reckless disregard for the
truth, and thus no Franks violation shown).

Defendants do not claim that any information included in the
affidavit in support of the first search warrant was false.
Rather, they argue that the affidavit omitted the facts that (1)
the affiant and another law enforcement officer had the day before
the application seen a person matching Martinez' description at 315
East Dodge Street and had *not* attempted to arrest him, despite
knowing there was an active warrant for his arrest; (2) affiant was
actually conducting a drug investigation; and (3) information tying
315 East Dodge Street to drug trafficking had been received at
times in the preceding months from proffer interviews of drug
defendants.  Defendants claim the omission of these facts misled
the issuing magistrate judge as to the "purpose" of the search to
be conducted, in violation of Franks.

Had the omitted information been included in the affidavit, it
would not have destroyed the probable cause apparent from the facts
that were recited in the affidavit.  The information presented
recited that Martinez was a fugitive and that certain information
tied him to the residence at 315 East Dodge Street.  It created a
fair probability that either Martinez himself or information about
his whereabouts would be found therein.  Illinois v. Gates, 462
U.S. 213, 238 (1983).  Nothing more was required.

In fact, the officer's true motive for seeking the warrant,
even supposing it to have been furtherance of his ongoing drug
investigation, was irrelevant to the probable cause inquiry.
Ironically, defendants cite Whren v. United States, 517 U.S. 806
(1996) in support of their arguments.  However, Whren stands for
the proposition that the underlying motive of an officer in

conducting a traffic stop is irrelevant if the objective facts establish probable cause for the stop.  Id. at 813.  Whren has been applied to other Fourth Amendment contexts as well.  See United States v. Villamonte-Marquez, 462 U.S. 579 (1983)(Customs officer did not violate Fourth Amendment by boarding vessel without reasonable suspicion of a law violation, pursuant to a statute authorizing customs officers to board any vessel at any time to examine vessel's manifest and other documents, and later searching vessel when, after he had boarded it, he smelled marijuana, even though at the time of the boarding, the customs officer had been given an anonymous tip that a vessel in the area was carrying marijuana); United States v. Abumayyaleh, 530 F.3d 641, 648-49 (8th Cir. 2008) (rejecting defendant's argument that officer's true intent of searching for weapons violated Fourth Amendment because search warrant was for stolen articles); United States v. Quezada, 448 F.3d 1005, 1008 (8th Cir. 2006) (applying Whren to entry of an apartment to carry out "public caretaker" responsibilities, if the objective facts established that officer could reasonably have believed an emergency existed); United States v. Roggeman, 279 F.3d 573, 580, n. 5 (8th Cir. 2002) ("[I]t is of no consequence 'that the motivation for the search did not coincide with the legal justification' for the search," citing cases; otherwise justified search does not violate Fourth Amendment because officer's underlying motive was to investigate "hunches" regarding criminal activities unrelated to that justification); United States v. LaMorie, 100 F.3d 547 (8th Cir. 1996)(Fact that searching officers may have been looking for weapons when executing a warrant search for items related to a burglary did not violate Fourth Amendment, citing Horton v. California, 496 U.S. 128, 138-40 (1990) (Holding that if officer "has a valid warrant to search for one item and merely a suspicion concerning the second, whether or not it amounts to probable cause, we fail to see why that suspicion should

11

immunize the second item from seizure if it is found during a lawful search for the first." 496 U.S. at 139).

No statements in the first warrant application were shown to be false or misleading, and the inclusion of the drug-investigation information would not have influenced the finding of probable cause.  There was no Franks violation.

Next, defendants argue that the officers' search pursuant to the first warrant exceeded the scope of the warrant.  I disagree. Although the particularity requirement of the Fourth Amendment prohibits a "general, exploratory rummaging in a person's belongings," (Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971)), when a search warrant authorizes a search for "items of venue" associated with a fugitive, the officers are charged with the duty to find anything at the location being searched with any ties to any person associated with that place, including the fugitive. Such items can include, in addition to the obvious examples such as utility bills or other mail, things that might associate a person with the fugitive sought by the warrant, such as pictures, CDs, business cards, cell phones, or even products with serial numbers that might be traced to a particular location.  The officers are legally permitted to search anyplace where such items may be found, including containers in which they might be hidden.  "A lawful search extends to all areas and containers in which the object of the search may be found." United States v. Schmitz, 181 F.3d 981, 988 (8th Cir. 1999) (search of jacket pocket, in which marijuana was found, pursuant to warrant to search for socks and shirt did not exceed scope of warrant).  See also Abumayyaleh, 530 F.3d at 648-49 (scope of warrant search for stolen video games in convenient store was not exceeded when officers searched defendant's office for such items and found weapons); United States

v. Neal, 528 F.3d 1069, 1074 (8th Cir. 2008) (scope of warrant
search for weapons and ammunition was not exceeded by officers
looking in film canister found in gun case).  Such places
legitimately include garages, laundry baskets and their
surroundings, dresser drawers, spaces between or in mattresses, the
surfaces of floors under and behind furniture, and even places
where a person might "hide" such items if trying to conceal his/her
whereabouts or the whereabouts of another, so long as the search
does not exceed the "reasonableness" standard of the Fourth
Amendment.[6]  See, e.g., United States v. Blakeney, 942 F.2d 1001
(6th Cir. 1991) (Opening and searching through suitcase filled with
documents did not exceed warrant authorizing search for "indicia of
occupancy" in the premises).  In short, as bemoaned by the
defendants, such a warrant does, in effect, authorize a complete
search of a residence, because such items may be reasonably
expected to be found practically anywhere a piece of paper may be
hidden, provided it is reasonable under the circumstances.

In this case the search team did not exceed the scope of the
warrant or even approach the legal boundaries of it.  All of the

---

[6]     A warrant to search a house or other building
        authorizes the police to search any closet,
        container, or other closed compartment in the
        building that is large enough to contain the
        contraband or evidence that they are looking
        for.  If they are looking for a canary's
        corpse, they can search a cupboard, but not a
        locket.  If they are looking for an
        adolescent hippopotamus, they can search the
        living room or garage but not the microwave
        oven.  If they are searching for cocaine,
        they can search a container large enough to
        hold a gram, or perhaps less.

United States v. Evans, 92 F.3d 540, 543 (7th Cir. 1996)
(citations omitted).

places searched were places that papers might be hidden.  In fact, the witnesses testified that in their experience, venue items had been found in other searches in similar locations.[7]  The officers did not exceed the scope of the first warrant when executing the search.

The affidavit stated that the items listed above were found in "plain view."

> The plain view doctrine permits law enforcement officers to "seize evidence without a warrant when (1) 'the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed,' (2) the object's incriminating character is immediately apparent, and (3) the officer has 'a lawful right of access to the object itself.'"  United States v. Hughes, 940 F.2d [1125] 1126-27 (8th Cir. 1991), quoting Horton v. California, 496 U.S. 128 (1990).

United States v. Weinbender, 109 F.3d 1327, 1330 (8th Cir. 1997)(Plain view doctrine applied and scope of warrant search for clothing was not exceeded by officer removing picture on closet wall, removing piece of loose drywall behind the picture, and removing wood pieces behind the drywall, finding weapon silencer, when police had been told by defendant's ex-wife he had hiding places in his residence).

Here, the officers did not exceed the scope of the search. They were at all times where they were authorized to be, and the

---

[7] Even if one excludes the two search techniques here that may be questionable, the looking into the Gott cooler and the removal of the mirror from the bathroom wall to see behind it, the other items found were unquestionably within the scope of where one might reasonably expect papers to be hidden.  Because of the "inevitable discovery" doctrine discussed *infra*, (and not argued by the government), precisely addressing such a categorization is not critical.

14

items listed as being in plain view (the two containers of MSM, hot plate, denatured alcohol, and glass bowls in the garage, and the denatured alcohol in the laundry room) were in fact in plain view, that is, nothing was required to be moved in order to see them. Further, their incriminating nature was immediately apparent to the officers, who were well trained and experienced in narcotics investigation.

Further, the officers had lawful authorization to search in the laundry hamper, as such a container may easily contain "pocket trash" which, as described by Investigator Javins, could very likely include items of venue. His searching of the hamper literally uncovered the digital scale, which was immediately apparent as incriminating.

I conclude that the same is true with the searching of the wall behind the bathroom mirror. Deputy Ackles testified that before he moved or touched the mirror, he shined his flashlight behind it and saw "torn sheet rock paper" which he thought to indicate that the wall had been "altered." This discovery permitted him to look behind the mirror for venue items. In fact, venue items (business cards) were found in the hole thus exposed, as well as the methamphetamine.

This leaves the cooler. As stated in note 7, above, however, the cooler would have been inevitably discovered by the officers' executing the second warrant. Thus, even if Investigator Javins exceeded the scope of the first search warrant in opening the cooler, thus violating the Fourth Amendment, such does not result in suppressing the cooler or its contents, because the second affidavit clearly established probable cause to search for drugs after the other items listed had been found. The cooler would have

15

been searched during the second search pursuant to the second warrant, and its contents found.  See Nix v. Williams, 467 U.S. 431, 444 (1984) (Prosecution may use information discovered after police violate the Fourth Amendment, "if the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means."   The Eighth Circuit has stated that the inevitable discovery doctrine entails two requirements: (1) there is a reasonable probability the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation. United States v. Thomas, 524 F.3d 855, 858 (8th Cir. 2008) citing United States v. Glenn, 152 F.3d 1047, 1049 (8th Cir.1998)[8]  In this case the two requirements are met, because the evidence in the cooler would have been discovered in the second search, and at the time of its discovery, the officers were searching for Fidel Martinez or items of venue connecting him with the residence, a line of investigation separate from the drug investigation commenced as a result of the first search.


     In accordance with the foregoing,


     IT THEREFORE HEREBY IS RECOMMENDED to the Hon. Richard G. Kopf, United States District Judge, that the motions to suppress, filings 45 and 57, be denied in all respects.

     The parties are notified that failure to object to this report and recommendation in accordance with the order below may be held to waive the right to appeal the findings herein.

---

[8] Two of the judges in Thomas concurred, arguing that the Eighth Circuit's formulation of the standard differs from that of the Supreme Court and should be revisited.  524 F.3d at 860-863.

FURTHER, IT HEREBY IS ORDERED:

1.  The parties are given until ten working days following the filing of the transcript of the hearing on these motions in which to file their objections to this report and recommendation.

2.  Trial of this matter is set to commence at 9:00 a.m. on October 6, 2008 before the Hon. Richard G. Kopf, United States District Judge.  Jury selection will be held at commencement of trial.  Trial is scheduled for a duration of four trial days.

DATED August 8, 2008.

BY THE COURT:

s/ *David L. Piester*

United States Magistrate Judge